# Exhibit 11

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306
Tel 202.955.8500
gibsondunn.com

Stephen Weissman
Direct: +1 202.955.8678
Fax: +1 202.530.9685
SWeissman@gibsondunn.com

April 3, 2023

Altumash Mufti
Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 445-7917
amufti@ftc.gov

**RE:    Civil Investigation Demand, FTC File No. 211-0155**

Dear Al:

On behalf of Retail Services & Systems, Inc., d/b/a Total Wine & More ("TWM"), I hereby provide via secure file transfer documents bearing Bates numbers TWM-CID-000001 through TWM-CID-0000017.  TWM hereby designates all documents in this production as "HIGHLY CONFIDENTIAL – TRADE SECRET INFORMATION" and respectfully requests that the Federal Trade Commission ("FTC") treat such documents accordingly and as exempt from any FOIA requests, in accordance with the FTC Act and all applicable rules and regulations.

During our March 15, 2023 meet and confer, the FTC identified Specification Nos. 2, 10, 18, and 19 as "priorities" on which TWM should focus in the short term.  During our March 22, 2023 meet and confer, we explained that TWM would focus on those priority Specifications and would endeavor to diligently respond to them in the coming weeks.  In Part I below, we reaffirm our prior oral objection to the return date specified in the CID.  In Part II below, TWM provides objections and responses to the FTC's priority Specifications. TWM's responses submitted with this letter include the production of the sample data sets that your colleague, Wells Harrell, requested on March 22 as an interim step to assist Bureau of Economics staff evaluate staff's data needs from TWM.  In Part III below, TWM provides its preliminary comments and objections to the non-priority Specifications.  The parties have not yet had any substantive discussions about these non-priority Specifications, and TWM is hopeful that the information in Part II will lead to discussions in the future.

TWM remains very concerned about the entirety of the scope of the CID, including the substantial burdens it would inflict on its business operations and the need for certain highly proprietary TWM information requested.  Our sincere hope, however, is that, through this letter and our upcoming meeting on April 4, Staff and TWM can make substantial progress in reaching a resolution of TWM's concerns about the CID consistent with the Commission's need for relevant information regarding its investigation of Southern Glazer's Wine and Spirits, LLC ("SG").  As reflected in the FTC's letter dated March 24, 2023, TWM's current deadline to file a petition to limit or quash the CID is April 7, 2023.  We are

**GIBSON DUNN**

Altumash Mufti
600 Pennsylvania Avenue NW
April 3, 2023
Page 2


prepared to make such a filing, but again, our strong preference is to work with you in good faith to reach a global resolution of the CID's requirements as to TWM.

Now that TWM has addressed in good faith the FTC's priority Specifications and offered its initial positions on the non-priority Specifications, we respectfully request that, pursuant to 16 CFR § 2.10(a)(5), the FTC extend TWM's deadline to file its petition to limit or quash to May 5, 2023. This modest extension should provide the FTC time to evaluate the information responsive to the priority Specifications and the parties sufficient time and meaningful opportunity to discuss the scope and breadth of the remaining Specifications, including non-priority Specifications, so we can both avoid the distraction and delays associated with motions practice. As you have repeatedly stated, TWM is a non-party, non-target of the Staff's investigation. Consequently, we hope that you will work cooperatively with us to get you the information you reasonably need from TWM while remaining sensitive to the substantial burdens and distractions the CID would inflict on our client.

We look forward to discussing this letter and accompanying document production during our meet and confer scheduled for April 4, 2023.


\* \* \* \*

**GIBSON DUNN**

Altumash Mufti
600 Pennsylvania Avenue NW
April 3, 2023
Page 3

## I.   OBJECTIONS TO RESPONSE DATE IN CID, INCLUDING AS MINIMALLY MODIFIED

Section 2.7(b) of the FTC Rules of Practice states, in relevant part, that CIDs for the production of documentary material, including ESI, "shall . . . prescribe a return date *providing a **reasonable period of time** within which the material so demanded may be assembled and made available* for inspection and copying or reproduction." (Emphasis supplied).  The CID, which was served on February 27, 2023, and had a return date of March 25, 2023 (since extended to April 7, 2023), contains nineteen different specifications with numerous sub-parts, covering a period of more than five years.  TWM, therefore, objects to the return date (as minimally modified) as unreasonable on its face and in violation of Rule 2.7(b).  TWM, nevertheless, will continue to work in good faith with the Staff to understand the FTC's needs and work to appropriately narrow the scope of certain Specifications, which will facilitate the production of information on a reasonable timeframe contemplated by Rule 2.7(b).

## II.   PRIORITY SPECIFICATIONS

### A.   Objections to Definitions

**Definition D.7**

**The term "Distributor" means any person that Distributes a Relevant Product.**

TWM objects to this term as overbroad.  As we explained during prior telephonic meet and confers, any information related to TWM's purchase and sale of wines or spirits *not* distributed by SG is irrelevant, and production of such information would significantly exacerbate the unduly burdensome nature of the CID.  More details regarding such burdens are described below in the discussion of the Specifications.  The CID is clear that the FTC's investigation is focused only on SG.  *See* CID pg. 1.  Therefore, the term "Distributor" should be limited to SG.  Defining such a term in a manner that includes irrelevant information about other distributors or the wine and spirit products they distribute for suppliers is overbroad and would unnecessarily add significant burdens to TWM that are disproportionate to any conceivable relevance.

Here, the need to limit the definition is especially warranted because TWM is a third-party witness, not a subject or target of FTC's investigation.  Federal courts provide third parties protection from overbroad and burdensome discovery during civil litigation.  *E.g.*, FED. R. CIV. P. 45(d)(1) ("A party or attorney responsible for issuing and serving a subpoena

**GIBSON DUNN**

Altumash Mufti
600 Pennsylvania Avenue NW
April 3, 2023
Page 4

must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena.")  If the FTC needs information or data related to other distributors, it would be more appropriate and efficient to obtain that information from the distributors directly.

Thus, TWM proposes to limit the definition of "Distributor" to SG unless expressly stated differently in its responses to the Specifications set forth below.  Moreover, we are available to meet and confer with you to discuss certain requests for which you believe you need information from TWM about distributors other than SG to address our objections above.  We request that you come prepared on April 4 to do so.

**Definition D.15**

**The term "Relevant Product" means, and information shall be provided separately for (a) wine Distributed, purchased, or sold at the retail level and (b) spirits Distributed, purchased, or sold at the retail level. For the avoidance of doubt, the term "Relevant Product" includes wine and spirits intended for both off-premises and on-premises sales.**

TWM objects to this term as overbroad and unduly burdensome, as described in more detail below.  TWM incorporates its objections to Definition D.7 above.  TWM proposes to limit the definition of "Relevant Product" to only wines or spirits distributed by SG unless expressly stated differently in its responses to the Specifications set forth below.  Moreover, we are available to meet and confer with you to discuss certain requests for which you believe you need information from TWM about products not distributed by SG to address our objections above.  We request that you come prepared on April 4 to do so.

**Instruction 1.1**

**All references to year refer to calendar year.  Unless otherwise specified, each of the Specifications calls for documents and information dated, created, modified, sent, received, or in effect from January 1, 2018 to the present. Where information, rather than documents, is requested, provide it separately for each year; where yearly data is not yet available, provide data for the calendar year to date. If calendar year information is not available, supply the Company's fiscal year data indicating the 12-month period covered, and provide the Company's best estimate of calendar year data.**

TWM objects to the five-plus year date range (January 1, 2018, to present) for documents and other information requested in the CID.  This 64-month date range is overly broad, unduly burdensome to comply with, and disproportionate to the needs of the

**GIBSON DUNN**

Altumash Mufti
600 Pennsylvania Avenue NW
April 3, 2023
Page 5

investigation, especially given that TWM is a non-party to the investigation.  Requiring TWM to search for, collect, review, and then assemble for production 64 months' worth of materials would inflict hundreds of thousands of dollars in costs and distraction on TWM's business operations and divert TMW's scarce IT and other resources from time-sensitive business projects that are mid-stream and for which TWM already has committed substantial investment dollars.  TWM proposes to discuss appropriate time periods for each specification, to which TWM will respond during our April 4, 2023, meeting.

### B.  Objections and Responses to Priority Specifications

#### Specification No. 2

**Submit an electronic spreadsheet listing each Company store in the Relevant Area that sells or has sold any Relevant Product at any time from January 1, 2018 to present. For each such Company store, provide the following information:**

   **(a)  the store number and any other unique number, code, value, or name used by the Company to identify or refer to the store;**
   **(b)  the street address, city, county, state, and zip code;**
   **(c)  the name of any department that sells or has sold any Relevant Product;**
   **(d)  the operating region, metropolitan statistical area, or micropolitan statistical area served;**
   **(e)  the primary trade or draw areas *(i.e.,* the smallest geographic area closest to the store where approximately 50% and 85% of the store's customers reside);**
   **(f)  annual sales, by units and dollars, of all spirits products;**
   **(g)  annual sales, by units and dollars, of all wine products;**
   **(h)  the date originally opened, or projected to open, and the date closed, or expected to close, as applicable;**
   **(i)  the number of distinct Relevant Products, by SKUs, UPCs, or unique products if SKU information is not available, the store sells or has sold annually, broken out separately by spirits and wines and by year;**
   **(j)  the name, address, and contact information for any Distributor that sells or has sold any Relevant Product to the store;**
   **(k)  the name and address of any Company distribution center, warehouse, sortation center, or storage facility that services or has serviced the store, or that receives or holds inventory of any Relevant Product for any period of time for the store;**
   **(l)  the name and address of all competing off-premise retail stores engaged in the sale of any Relevant Product; and**

# GIBSON DUNN

Altumash Mufti
600 Pennsylvania Avenue NW
April 3, 2023
Page 6

   **(m) variables or metrics used in the ordinary course of business to evaluate the store's Competitive position, including market share.**

TWM incorporates its objections to the terms "Relevant Product" and "Distributor," as set forth above.

The document produced with Bates number TWM-CID-0000001 - TWM-CID-0000016 contains information responsive to subparts (a), (b), (d), and (h) and reflects the store numbers, addresses, operating region, and open/closed date for each store in the states where TWM purchases wines or spirits from SG or its affiliates.  Below is a list of each state in which TWM sells wines and spirits that it purchased from SG or its affiliates, which is information sought by subpart (j):

1. Arizona
2. California
3. Colorado
4. Delaware
5. Florida
6. Illinois
7. Indiana
8. Kentucky
9. Louisiana
10. Maryland
11. Michigan
12. Minnesota
13. Missouri
14. New Mexico
15. Nevada
16. New York
17. South Carolina
18. Texas
19. Washington[1]

Subject to reaching an agreed reasonable extension and resolution of the CID with staff, TWM proposes to undertake the work necessary to assemble and produce data that

---

[1] TWM operates stores in 8 states where it does not buy wines or spirits from SG.  Those states are Connecticut, Georgia, Massachusetts, North Carolina, New Jersey, Tennessee, Virginia, and Wisconsin.

**GIBSON DUNN**

Altumash Mufti
600 Pennsylvania Avenue NW
April 3, 2023
Page 7

reflects TWM's marketing assessment of the geographic areas where 50% and 85% of the customers for each store within the states where TWM purchases wines or spirits from SG or its affiliates.  Such data will be responsive to subpart (e).

      For subpart (c), TWM does not have "departments" within its stores that sell or have sold wines or spirits distributed by SG.  Products within TWM's stores are categorized by type, such as "wine" or "spirit," for organizational purposes, but structural departments for purposes of sales do not exist.

      Subparts (f), (g), and (i) call for store-level sales data that is reflected in other Specifications, including Specification No. 10, but limited to SG.  Therefore, TWM refers the FTC to its responses to those Specifications.

      For subpart (k), TWM does not own or operate any "distribution centers" or "sortation centers" as we understand those terms.  Recently, however, TMW began to utilize warehouses in two states (i.e., California and Florida) to hold alcohol inventory that could not be received in the stores due to insufficient storage capacity.  The warehouses are used to replenish inventories in the California or Florida stores when needed.  With this exception, TWM's inventory is held in the stores where it sells the products.  Further, where permitted by state law, TWM will occasionally rebalance inventories between stores to meet demand by transferring inventory from one store to another in the same state.

      For subpart (l), TWM does not maintain comprehensive data sets that contain the requested information about "all competing off-premise retail stores."  TWM can and has identified competing retailers through various channels, such as the internet, advertisements, physical locations, etc., but it does not maintain such comprehensive data, nor can it create such data sets for the FTC in response to this Specification.

      For subpart (m), TWM does not maintain business variables and metrics regarding competitive positions or market shares on a store-by-store basis.

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP

1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306
Tel 202.955.8500
gibsondunn.com

Stephen Weissman
Direct: +1 202.955.8678
Fax: +1 202.530.9685
SWeissman@gibsondunn.com

**Specification No. 10**

**Submit a Data Set or electronic spreadsheet reporting the Company's sales of Relevant Products by Company store, by SKU/UPC/item number, by week, and from January 1, 2018 to present, including:**

    **(a) a description of the product** *(e.g.,* **brand, flavor, bottle size, package type);**

    **(b) gross sales in units and dollars;**

    **(c)  total discounts, rebates, promotions, coupons, scanbacks, returns, price reductions, or other adjustments, listed separately by type;**

    **(d) net sales in units and dollars, after accounting for all discounts, rebates, promotions, coupons, scanbacks, returns, price reductions, or other adjustments;**

    **(e) the cost of goods sold;**

    **(f) any adjustments** *(e.g.,* **slotting allowances, merchandising allowances, marketing development funds, volume discounts) to cost of goods sold (specified and listed separately); and**

    **(g) the advertised sales price of the product.**

        TWM incorporates its objections to the terms "Relevant Product" and "Distributor," as set forth above.

        TWM objects to this specification as overly broad and because compliance would inflict unreasonable burdens on TWM.  As we described on our March 22 call, during the relevant time period, TWM has purchased over 21,000 different wine or spirit products from SG alone.  Weekly sales data for just those products over the 272 weeks since January 1, 2018—which is what Specification No. 10 seeks—will result in approximately 5.7 million transaction-level entries, each of which then requires additional data points for product description, dollars sold, units sold, costs, etc.  Simply put, tens of millions of datapoints are implicated for Specification No. 10 alone.  And then once the data is queried and pulled using expensive cloud-computing software, TWM then must redeploy substantial employee resources to review and validate such data prior to production to the FTC.  TWM is unable to produce data that it has not validated as accurate and reliable.  This pulling and validation process is a cross-functional effort involving numerous employees critical to other preexisting and ongoing business objectives.  TWM estimates that undertaking such an exercise for Specification No. 10 will cost hundreds of thousands of dollars in lost time and productivity at a time when TWM also needs those computing and personnel resources to support the immediate demands of its business.  Such burdens exist even when limiting the definitions of "Relevant Product" and "Distributor" to SG.  Expanding these burdens to include *every* wine or spirit that TWM has purchased from *every* distributor over more than five years would be grossly overbroad, unduly burdensome, and disproportionate to the needs of the investigation.

Abu Dhabi · Beijing · Brussels · Century City · Dallas · Denver · Dubai · Frankfurt · Hong Kong · Houston · London · Los Angeles
Munich · New York · Orange County · Palo Alto · Paris · San Francisco · Singapore · Washington, D.C.

**GIBSON DUNN**

Altumash Mufti
600 Pennsylvania Avenue NW
April 3, 2023
Page 9


In response to Mr. Harrell's request on March 22, 2023, TWM hereby produces as a sample sales data for the top-five selling wines and top-five selling spirits, as determined by Nielson Global Solutions, that are predominately distributed by SG (the "Nielson Sample"). With minor variation, the data provided on these ten products represent purchases from SG.[2] These ten products account for a substantial portion of the national sales at all retail channels. For example, the five wines in the Nielson Sample are as follows:

1. Josh Cabernet Sauvignon California State, 750ml

2. Kendall-Jackson Vntrs RSV Chardonnay California State, 750ml

3. Meiomi Pinot Noir Monterey County, 750ml

4. Kim Crawford Sauvignon Blanc New Zealand, 750ml

5. Josh Chardonnay North Coast, 750ml

In the last 52 weeks ending February 4, 2023, these five wines accounted for $765 million in sales, according to the latest publicly available data from Nielson.

The five spirits are as follows:

1. Tito's Vodka 80 Proof, 1.75ml glass bottle

2. Tito's Vodka 80 Proof, 750ml glass bottle

3. Patron Silver Tequila 80 Proof, 750ml glass bottle

4. Jameson Reg Irish Whiskey 80 Proof, 750ml glass bottle

5. Jameson Reg Irish Whiskey 80 Proof, 1.75ml glass bottle

---

[2] In most states where TWM operates, SG is the exclusive distributor for these 10 products. In a few states, we believe that SG, while the predominant distributor, is not exclusive. We used a Nielsen Sample because quantifying variations by distributors is exceedingly difficult, not performed in the ordinary course of business, and such an exercise would require a product-by-product and state-by-state inquiry.

**GIBSON DUNN**

Altumash Mufti
600 Pennsylvania Avenue NW
April 3, 2023
Page 10

In the last 52 weeks ending February 4, 2023, these five spirits accounted for $1.28 billion in sales, according to the latest publicly available data from Nielson.

The document produced with Bates number TWM-CID-0000017 contains data for retail sales of the Nielson Sample in the states where TWM purchases wines or spirits from SG or its affiliates.  The data is responsive to subparts (a), (b), (d), (e), and (g).  The following chart describes the column headers in TWM-CID-0000017:

| Column Header | Description |
|---|---|
| FISCAL_YEAR | The fiscal year ranging from 2018 to 2023 |
| FISCAL_WEEK | The fiscal week ranging from 1 to 52 |
| STORE_NUM | The unique number that TWM assigns to each store |
| STORE_NAME | The unique name that TWM assigns to each store |
| STATE_ABBR | The state where the store is located |
| ITEM_CODE | The unique identifying number that TWM assigns to each product |
| ITEM_NAME | The product name |
| UPC | The UPC |
| CLASS | The category of product |

**GIBSON DUNN**

Altumash Mufti
600 Pennsylvania Avenue NW
April 3, 2023
Page 11

| SIZE | The volume of each unit |
|------|------------------------|
| COGS_CS | The average weekly cost of goods sold, by case, for the fiscal week, which is calculated as follows: AVG((Cost * Units_Per_Case)) |
| UCOGS | The average weekly cost of goods sold, by unit, for the fiscal week, which is calculated as follows: AVG(Cost) |
| AD_PRICE | The average weekly posted price for the fiscal week: AVG(Orig_Unit_Price) |
| TOT_UNITS_SOLD | The total number of units sold during the fiscal week, which is calculated as follows: SUM(Quantity) |
| TOT_UCOGS | The total weekly cost of goods sold, by unit, for the fiscal week, which is calculated as follows: SUM(Cost) |
| GROSS_SALES | The total sales for the fiscal week, which is calculated as follows: SUM(Orig_Unit_Price * Quantity) |
| NET_SALES | The total sales for the fiscal week, less returns and adjustments, which is calculated as follows: SUM(Sales_Dollars) |

Subpart (c) is an immensely burdensome and difficult request. While the terms used in subpart (c) are somewhat imprecise—e.g., TWM does not maintain unique data called "promotions"—the type of data sought by subpart (c) is not available in the main system that TWM has used for other subparts discussed above. Based on a preliminary investigation, TWM is uncertain whether historical data reflecting various adjustments to either laid-in-cost from the wholesaler (e.g., single-purchase quantity discounts or cumulative quantity

**GIBSON DUNN**

Altumash Mufti
600 Pennsylvania Avenue NW
April 3, 2023
Page 12

discounts based upon purchases that may occur over many months) or adjustments to retail sales dollars and margin (e.g., advertised "limited time specials," TWM  or manufacturer coupons), among others, is even available today from other business records or if it can be tied to specific item transactions for the last 272 weeks, as the FTC requested.  To be clear, the total amount of adjustments is reflected in column Q's "NET_SALES" (*see* TWM-CID-0000017), but identifying each type of adjustment as required by subpart (c) (if that's even possible) would be a very tedious and costly undertaking for any third-party witness to have to undertake and would far outweighed any probative value it may have on the FTC's investigation of SG.

Given our intentional focus on other areas, we are willing to continue to investigate whether and how such data can be obtained from other records and/or systems and tied to weekly sales in the manner requested by the FTC, and the likely cost of any such effort.  Subject to reaching a reasonable extension and resolution of the CID with Staff, TWM is willing to continue its investigation of the availability of data necessary to respond to subpart (c), and if feasible, it will separately produce a dataset that contains certain data sought by subpart (c) along with, if necessary, an explanation of the data.  It would be helpful if the FTC could identify the data within subpart (c) that it considers a priority, which would allow TWM to focus its efforts there.  For example, if the FTC is primarily interested in data on coupons, TWM can prioritize its collection, verification, and production of such data.  If the FTC is not interested in "returns" because such data is an adjustment to inventory and not price (unlike the other components of subpart (c)), then TWM can redirect its efforts to more important data.

Subpart (f) seeks data that is not reflected in the retail sales data that TWM maintains in the ordinary course of business.  As explained in Part III below, TWM is willing to produce data related to its purchases from SG.  *See* Specification No. 7 below.  Data reflecting returns and adjustments are reflected in the "NET_SALES" data point in TWM-CID-0000017.

TWM is willing to consider expanding the size of the Nielson Sample to more than ten products, but doing so is extremely burdensome and time-consuming.  For example, TWM-CID-0000017, by itself, contains over 442,000 rows of data and 17 columns.  That equates to over 7.5 million data points that TWM had to validate prior to production.  This produced data set consumed nearly a week of time from a cross-functional team comprised of numerous employees who set aside business-critical efforts to assist with this project. Extending the Nielson Sample to the top 100 or top 300 selling wines or spirits would obviously increase the burden by orders of magnitude.  However, if the FTC is willing to identify a narrow set of wine or spirit products for additional data pulls, TWM would

**GIBSON DUNN**

Altumash Mufti
600 Pennsylvania Avenue NW
April 3, 2023
Page 13

consider doing so in the spirit of cooperation and as part of a broader resolution of TWM's objections to the CID.

**Specifications No. 18 & 19**

**Submit one copy of each organizational chart and personnel directory for the U.S. operations of the Company, including for each of the Company's subsidiaries, facilities, or divisions involved in the Distribution, marketing, promotion, or sale of any Relevant Product.**

**List each employee of the Company with managerial, supervisory, strategic, or decisionmaking responsibilities for selecting, negotiating Agreements with, purchasing from, or managing the Company's relationship with any Distributor or any supplier of any Relevant Product, and for each identify:**
   **(a) the specific responsibilities of the employee;**
   **(b) the dates the employee held such responsibilities for or participated in such activity;**
   **(c) the employee's job title(s) during such period; and**
   **(d) the name of the person to whom the employee reported during such period.**

TWM incorporates its objections to the terms "Relevant Product" and "Distributor," as set forth above.

During the March 15, 2023, meet and confer, we agreed with FTC staff to prioritize these Specifications to cover departments, managerial employees, and decisionmakers that interact with SG.  The relevant departments are Marketing Department, Supply Chain Department, and Market Management Department.  These departments, either individually or collectively, provide services to TWM's separate but affiliated store operating entities in the areas of purchasing, marketing, promotion, or sale of SG's wine and spirit products.  The below table contains information sought by Specification 19.[3]

---

[3] During the March 15, 2023 meet and confer, we discussed the possibility of identifying certain custodians who interact with SG on a regular basis, should the FTC decide to request documents from those custodians.  This process of identifying custodians is acceptable to TWM, subject to TWM's right to object to any specific requests for further documents based upon scope, burden, or relevance.  We are prepared to consider such requests and propose custodians once we have reached agreement with Staff on a narrowing of the CID and therefore understanding the scope of TWM's production, as doing so now would be premature and inefficient.  The same is true with regard to proposed search terms with

**GIBSON DUNN**

Altumash Mufti
600 Pennsylvania Avenue NW
April 3, 2023
Page 14

| Name | Title | Dates in Role | Direct Report |
|------|-------|---------------|---------------|
| Kevin Tyldesley | Senior Director, Market Management | Original Hire Date 08/31/2015<br><br>Time in Position 2 year(s), 0 month(s), 7 day(s) | Thomas Trone |
| Geoffrey Sherren | Senior Director, Market Management | Original Hire Date 04/16/2012<br><br>Time in Position 1 year(s), 11 month(s), 3 day(s) | Thomas Trone |
| Angela Weber | SVP Merchandising | Original Hire Date: 10/2/2006 | Troy Rice |
| Travis Smith | SVP Merchandising | Original Hire Date: 3/1/2003 | Troy Rice |

respect to searches of any electronic files.  Depending on TWM's production of materials, TWM may not need to use word searches to identify potentially responsive materials as part of a reasonably diligent search because it can identify, collect, and review such materials through approaches other than electronic word searches.

# GIBSON DUNN

Altumash Mufti
600 Pennsylvania Avenue NW
April 3, 2023
Page 15

| Name | Title | Dates in Role | Direct Report |
|------|-------|---------------|---------------|
| Paul Piho | VP New Store Group | Original Hire Date 01/01/1994<br><br>Time in Position 16 year(s), 7 month(s), 20 day(s) | Chris Galletto |
| Jen Burke | Senior Manager, Market Management | Original Hire Date 01/03/2012<br><br>Time in Position 1 year(s), 7 month(s), 27 day(s) | Geoffrey Sherren |
| Nichole Miller | Senior Manager, Market Management | Original Hire Date 02/13/2012<br><br>Time in Position 1 year(s), 7 month(s), 27 day(s) | Geoffrey Sherren |
| Leonard Giraldo | Senior Manager, Market Management | Original Hire Date 08/02/2010<br><br>Time in Position 1 year(s), 7 month(s), 27 day(s) | Kevin Tyldesley |

# GIBSON DUNN

Altumash Mufti
600 Pennsylvania Avenue NW
April 3, 2023
Page 16

| Name | Title | Dates in Role | Direct Report |
|---|---|---|---|
| Nina Arend | Manager, Market Management | Original Hire Date 02/03/2020<br><br>Time in Position 1 year(s), 5 month(s), 18 day(s) | Kevin Tyldesley |
| Nick Fraijo | Manager, Market Management | Original Hire Date 07/06/2005<br><br>Time in Position 0 year(s), 9 month(s), 23 day(s) | Jen Burke |
| Rob Brosnan | Manager, Market Management | Original Hire Date 03/05/2012<br><br>Time in Position 1 year(s), 7 month(s), 27 day(s) | Kevin Tyldesley |
| Meghan Capasso | Manager, Market Management | Original Hire Date 10/17/2016<br><br>Time in Position 1 year(s), 7 month(s), 27 day(s) | Geoffrey Sherren |

**GIBSON DUNN**

Altumash Mufti
600 Pennsylvania Avenue NW
April 3, 2023
Page 17

| Name | Title | Dates in Role | Direct Report |
|------|-------|---------------|---------------|
| Heather Kitson | Manager, Market Management | Original Hire Date 09/08/2020<br><br>Time in Position 0 year(s), 7 month(s), 28 day(s) | Nichole Miller |
| Erin Robertie | Manager, Market Management | Original Hire Date 02/11/2019<br><br>Time in Position 1 year(s), 5 month(s), 18 day(s) | Nichole Miller |
| Bill Barnhart | Manager, Market Management | Original Hire Date 02/17/1998<br><br>Time in Position 1 year(s), 9 month(s), 8 day(s) | Geoffrey Sherren |
| Marc Herman | Manager, Market Management | Original Hire Date 06/20/2022<br><br>Time in Position 0 year(s), 9 month(s), 9 day(s) | Leonard Giraldo |

**GIBSON DUNN**

Altumash Mufti
600 Pennsylvania Avenue NW
April 3, 2023
Page 18

| Name | Title | Dates in Role | Direct Report |
|------|-------|---------------|---------------|
| Heather Lalla | Assistant Manager, Store 801 | Original Hire Date 07/12/2011<br><br>Time in Position 0 year(s), 6 month(s), 3 day(s) | Nicholas Klinger |
| James Porter | Assistant Manager, Store 613 | Original Hire Date 09/21/2007<br><br>Time in Position 3 year(s), 0 month(s), 6 day(s) | Jen Parks |
| Mike McGuire | Manager, Store 2201 | Original Hire Date 07/17/2017<br><br>Time in Position 5 year(s), 8 month(s), 17 day(s) | Tom Shea |
| Sharon Martin | Assistant Manager, Store 701 | Original Hire Date 09/06/2012<br><br>Time in Position 9 year(s), 6 month(s), 13 day(s) | William White |

**GIBSON DUNN**

Altumash Mufti
600 Pennsylvania Avenue NW
April 3, 2023
Page 19

| Name | Title | Dates in Role | Direct Report |
|------|-------|---------------|---------------|
| Thomas Trone | VP, Merchandising | Original Hire Date 03/31/2003<br><br>Time in Position 1 year(s), 6 month(s), 2 day(s) | Angela Weber |

### III.   NON-PRIORITY SPECIFICATIONS

As explained above, TWM has focused on and substantially completed responses to the FTC's priority Specifications, with the exception of Specification No. 10, for which, at your suggestion, we have now provided a sample set of data on the agreed timeline.  After Staff analyzes those responses, and in furtherance of the FTC's investigation of SG, TWM would be willing to continue to discuss other Specifications and reasonable timelines for the production of information as contemplated by the FTC Rules of Practice.  *See* Section 2.7(b) (requiring CIDs for the production of documentary material to "prescribe a return date *providing a **reasonable period of time** within which the material so demanded may be assembled and made available* for inspection and copying or reproduction.") (emphasis added).

TWM offers below its preliminary positions on the non-priority Specifications, even though these Specifications are overbroad as written, unduly burdensome, and seek irrelevant information.  TWM incorporates by reference its objections to the unreasonable return date in the CID (as modified) and the terms "Relevant Product" and "Distributor," as set forth above, for each of the non-priority Specifications listed below.  TWM will work in good faith with the FTC to understand the FTC's needs and work to narrow the scope of certain Specifications.  In order to avoid inefficient, piecemeal collections and productions, TWM wishes to reach an agreement with Staff on these non-priority Specifications before it begins further preparing its responses and producing documents in response to the CID.

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306
Tel 202.955.8500
gibsondunn.com

Stephen Weissman
Direct: +1 202.955.8678
Fax: +1 202.530.9685
SWeissman@gibsondunn.com

## A.  Preliminary Positions on Non-Priority Specifications

### Specification No. 1

**For each calendar year from 2018 to 2022:**
> **(a) identify by state each Relevant Product sold by the Company;**
> **(b) state separately by state for each Relevant Product the volume sold by the Company in dollars and units; and**
> **(c) identify all Distributors from which the Company purchased each Relevant Product in each state.**

Subject to its objections to the terms "Relevant Product" and "Distributor," TWM believes that it will have provided all responsive information through its responses to Specification Nos. 2 and 10.

### Specification No. 3

**Submit:**
> **(a) all Agreements and Proposed Agreements between the Company and any Distributor or any supplier relating to any Relevant Product;**
> **(b) all documents relating to the negotiation, drafting, or evaluation of any such Agreement or Proposed Agreement; and**
> **(c) all documents relating to negotiations or discussions between the Company and Southern or any supplier regarding the availability, price, or quantity of any Relevant Product available for purchase by the Company.**

As an initial matter, TWM objects to the term "Agreement" as vague and ambiguous. *See* CID at D.2.  It is not limited to oral and written contracts, which could be the common and ordinary understanding of "agreement."  Instead, it is expanded to an "understanding," which definition would not be an agreement.  By way of example, TWM believed it had an understanding with the Staff after the March 15, 2023 meet and confer that TWM would prioritize responses to Specification Nos. 2, 10, 18, and 19, before further specifications and responses to the CID would be discussed.  Subsequent letter correspondence from the FTC makes clear that whatever "understanding" we thought the parties had, it did not rise to the level of an agreement.  Further, this definition includes an attempted catchall with the phrase "or term thereof," which adds to the vagueness and ambiguity of the definition.

TWM proposes to limit the definition of "Agreement" to written agreements in the nature of a contract or an amendment thereto, which includes purchase orders placed by the store and invoices issued by SG as part of fulfilling a purchase order.  Our understanding is that FTC does not want us to attempt to retrieve and produce five years of POs and wholesaler invoices, which would be difficult, costly, take a very long time, and impose

**GIBSON DUNN**

Altumash Mufti
600 Pennsylvania Avenue NW
April 3, 2023
Page 21

obligations on TWM that are disproportionate to the reasonable needs of the FTC's investigation.

TWM further objects to this Specification as overbroad since it seeks "all documents" on the designated topics.  In TWM's experience, retailers generally do not have "agreements" with distributors in the same way that suppliers or manufacturers might have distribution or franchise agreements with wholesalers.  As noted above, retailers order wines and spirits from licensed wholesalers through purchase orders, and wholesalers fulfill those orders by delivering the goods in the quantities and at the prices specified in the purchase order.  At the time of delivery, the wholesaler (or its agent) tenders an invoice payable upon receipt or within a short period of time thereafter based on applicable state law.  Purchase orders, once accepted, form what one could regard as an "agreement" between the wholesaler and the retailer.  But whether and how goods may be delivered, accepted, and rejected is often prescribed by state law, not by agreement between the parties.

This Specification calls for documents that are also within the possession of SG.  In the spirit of cooperation, and subject to reasonable extensions of the CID date and reaching an agreement on other Specifications, if the FTC informs TWM that it was unable to obtain a particular agreement or document related to TWM's prior business dealings with SG, TWM will conduct a reasonable search to locate such documents so long as the FTC provides the relevant time period and other information to facilitate TWM's efforts.

## Specification No. 4

**Describe in detail the process by which the Company negotiates for or is notified of available pricing, discounts, rebates, promotions, coupons, scanbacks, price adjustments, or other concessions for any Relevant Product purchased from Southern or any supplier.  Submit and identify by document control number all documents used to prepare the response to this Specification.**

TWM objects to this Specification because of the five-plus year time frame of the request and the unreasonable return date.  In the spirit of cooperation, and subject to a reasonable extension of the CID return date and resolution of TWM's objections, TWM would undertake the work needed to assemble and provide a narrative response that explains the requested business practices as they relate to SG for the states where TWM purchases wines or spirits from SG.

**GIBSON DUNN**

Altumash Mufti
600 Pennsylvania Avenue NW
April 3, 2023
Page 22

**Specification No. 5**

**Describe in detail each service Southern or any supplier furnishes, has furnished, contracted to furnish, contributed to furnishing, offered to furnish, or that the Company has requested Southern or any supplier furnish, to the Company from January 1, 2018 to the present. Submit and identify by document control number all documents used to prepare the response to this Specification.**

TWM objects to this Specification because of the five-plus year time frame of the request and the unreasonable return date.  In the spirit of cooperation, and subject to a reasonable extension of the CID return date and resolution of TWM's objections, TWM would undertake the work needed to assemble and provide a narrative response that explains the requested business practices as they relate to SG for the states where TWM purchases wines or spirits from SG.

**Specification No. 6**

**For each service identified in response to Specification 5 above, submit documents, an electronic spreadsheet, or a Data Set sufficient to show:**
   **(a) the provider or offeror of the service;**
   **(b) the service provided or offered;**
   **(c) the date(s) or time period(s) during which the service was provided or offered;**
   **(d) the Relevant Product(s) involved;**
   **(e) the store location(s), geographic area(s), and state(s) in which the service was provided or offered;**
   **(f) the name, title, and affiliation of any person who acted as a provider, offeror, receiver, or offeree of the service;**
   **(g) the method by which the Company was notified of the availability of the service provided or offered;**
   **(h) the date(s) of, participants in, and substance of any communication with Southern or any supplier about the service; and**
   **(i) any consideration the Company provided for the service.**

TWM objects to this Specification because of the five-plus year time frame of the request and the unreasonable return date.  In the spirit of cooperation, and subject to a reasonable extension of the CID return date and resolution of TWM's objections, TWM would undertake the work needed to assemble and provide a narrative description of the types of services described in its response to Specification No. 5.  TWM currently believes that it does not maintain comprehensive data sets relating to specific services provided by SG in each state where TWM's business operates.

GIBSON DUNN

Altumash Mufti
600 Pennsylvania Avenue NW
April 3, 2023
Page 23

## Specification No. 7

**For each Relevant Product purchased from any Distributor, submit a Data Set or electronic spreadsheet that includes the following, from January 1, 2018 to present:**
  (a) **SKU, UPC, or any other item number;**
  (b) **product description and other product information** *(e.g., brand, flavor, bottle size, package type);*
  (c) **product manufacturer or supplier;**
  (d) **order date(s);**
  (e) **the Distributor receiving the order, including the Distributor's name and the geographic location of the Distributor's facility receiving, shipping, or delivering the order** *(e.g., address of the facility, city, state, county, and/or Metropolitan Statistical Area);*
  (f) **information on how the order was placed** *(e.g., method of communication, distributor contact name);*
  (g) **dollars paid, promised, or owed to the Distributor (e.g., purchase price), separately by SKU and fee type;**
  (h) **quantity ordered;**
  (i) **quantity ordered as expressed in equivalent units;**
  (j) **all quantity discounts available when the purchase was made;**
  (k) **all quantity discounts applied to the purchase;**
  (l) **all other discounts, rebates, promotions, coupons, scanbacks, price reductions, price adjustments, or other concessions available when the purchase was made;**
  (m) **all other discounts, rebates, promotions, coupons, scanbacks, price reductions, price adjustments, or other concessions applied to the purchase;**
  (n) **the name and address (including zip code) of the Company facility that received the delivery;**
  (o) **the name and address (including zip code) of each Company facility that warehoused, stored, stocked, displayed, offered for sale, or sold at retail the Relevant Product; and**
  (p) **date fulfilled, also noting if an order is not fulfilled.**

TWM incorporates its objections to Specification No. 10, as set forth above. TWM further objects because the information requested by this Specification is available directly from SG, and it is therefore unfair, duplicative, and unnecessarily burdensome for TWM, a third party, also to be required to undertake the work and expend the resources needed to respond to this Specification.

In the spirit of cooperation, and subject to a reasonable extension of the CID return date and reaching an agreement on other Specifications, TWM could produce a data set that

**GIBSON DUNN**

Altumash Mufti
600 Pennsylvania Avenue NW
April 3, 2023
Page 24

reflects all purchases of the Nielson Sample (defined in the response to Specification No. 10) within the states where TWM purchases wines or spirits from SG and would consider reasonable Staff requests commensurate with a revised scope for Specification 10. To be clear, the burdens described in the above response to Specification No. 10 exist here, too.

For subpart (e), TWM currently believes that it does not maintain comprehensive data about the locations of SG's facilities where the products were received, shipped, etc. As indicated, such information is more appropriately requested from SG or other distributors.

For subpart (f), TWM places hundreds of thousands of orders from distributors each year. Thus, TWM does not maintain comprehensive data about the method and manner in which it placed each order. TWM typically conducts all transactions via written or electronic purchase orders, and it is our understanding that the FTC does not want TWM to produce each purchase order with a distributor, nor would doing so be reasonable or proportionate to the needs of the investigation especially given the burden involved.

For subpart (o), and as explained elsewhere in these Responses, TWM will occasionally transfer products between stores to meet demand where allowed under the state law where those stores operate, and TWM occasionally utilizes a limited number of warehouses in certain markets to manage an increased demand in those markets that cannot be met by the space available in existing retail stores in those markets. Since the wines and spirits that TWM purchases are fungible commodities and producers/manufacturers often change distributors (or use different distributors in different states or regions), TWM does not specifically track wine or spirit inventory from the point of purchase to the moment of retail sale. Stated differently, when a retailer sells wines or spirits at retail, it is generally not concerned where that unit originated—i.e., the distributor or distribution facility—and, as a result, does not maintain comprehensive data linking distribution purchases to retail sales.[4]

---

[4] However, we do track the laid-in-costs of our inventory utilizing a FIFO method of accounting, which presumes that a quantity of goods acquired on February 1, 2022, will be depleted before subsequently purchased inventory of that same good.

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306
Tel 202.955.8500
gibsondunn.com

Stephen Weissman
Direct: +1 202.955.8678
Fax: +1 202.530.9685
SWeissman@gibsondunn.com

**Specification No. 8**

**Submit for each month from January 1, 2018 to the present, and separately for Relevant Products and for the Company as a whole, the Company's:**
    **(a) gross and net sales dollars, separately by revenue source;**
    **(b) cost of sales, separately by revenue source;**
    **(c) gross profit;**
    **(d) any other fixed or variable costs, separately by type;**
    **(e) operating income; and**
    **(f) net income.**

TWM incorporates its objections to Specification No. 10, as set forth above.  TWM further objects to this Specification as irrelevant and, to the extent it asks for product-by-product information because it would be unduly burdensome to comply with given the number of SKUs at issue (as indicated above, TWM has purchased over 21,000 different wine or spirit products from SG alone).  Such financial sales and profit information is not relevant to the FTC's investigation into SG's potential violation of the Robinson-Patman Act, nor has the FTC provided any such theory of relevance.  In terms of burden, TWM estimates that undertaking the exercise of assembling, reviewing, and producing such data will add substantially to the already hundreds of thousands of dollars in lost time and productivity at a time when TWM also needs those computing and personnel resources to support immediate demands of its business.  Such burdens exist even when limiting the definitions of "Relevant Product" and "Distributor" to SG.  Expanding these burdens to include *every* wine or spirit that TWM has purchased from *every* distributor over more than five years would be grossly overbroad, unduly burdensome, and disproportionate to the needs of the investigation.

**Specification No. 9**

**Identify each electronic database (including data sources used in or processed by the database) used or maintained by the Company that contains information concerning the Company's sales of Relevant Products. For each such database, submit a data dictionary**
**that includes:**
    **(a) a list of field names and a definition for each field contained in the Data Set;**
    **(b) the meaning of each code that appears as a field value in the Data Set; and**
    **(c) the primary key in the Data Set or table that defines a unique observation.**

In the spirit of cooperation, subject to a reasonable extension of the CID return date, and once we agree on the data set for Specification No. 10, TWM will provide the information requested in this Specification, including descriptions of field names.  TWM does not currently possess a data dictionary for its databases.

**GIBSON DUNN**

Altumash Mufti
600 Pennsylvania Avenue NW
April 3, 2023
Page 26


**Specification No. 11**

**Submit a Data Set or electronic spreadsheet that captures the following information tracked for loyalty card cardholders who have purchased any Relevant Product from the Company since January 1, 2018, including:**
    **(a) store identification value, as identified in response to Specification 2 above;**
    **(b) unique identifying value for the individual;**
    **(c) unique household identifier;**
    **(d) the 5 digit zip code of the individual's residential address; and**
    **(e) total monthly purchases of Relevant Products in dollars separately at each store.**

      TWM objects to this Specification because of the five-plus year time frame of the request and the unreasonable return date.  TWM also objects to this Specification as irrelevant.  Comprehensive data related to TWM's loyalty cardholders, including zip codes of families, is not relevant to SG's potential violation of the Robinson-Patman Act, nor has the FTC provided any such theory of relevance.

**Specification No. 12**

**Submit all documents related to competition in the market for retail sale of Relevant Products, including documents related to:**
    **(a) the market share, competitive position, and relative strengths and weaknesses of the Company and each of its actual or potential competitors, including all market share analyses related to the retail of Relevant Products prepared by the Company or any other analyst;**
    **(b) opportunities or attempts to win customers from any actual or potential competitor, or, threatened or actual losses of customers to any actual or potential competitor;**
    **(c) the Company's or any other person's price lists, pricing plans, pricing policies, pricing forecasts, pricing strategies, pricing analyses, and pricing decisions related to any Relevant Product;**
    **(d) the current and future requirements and barriers to entry or expansion in the retail sale of any Relevant Product;**
    **(e) the actual or potential entry, expansion, exit, or contraction, of any actual or potential competitor, including the contemplated or actual effect of such entry, expansion, exit, or contraction on the Company's sales, pricing, costs, product offering, or performance; or**
    **(f) the capacity, product volume, number of retail locations, amount of square footage, or other factors required to attain any available cost savings or other**

**GIBSON DUNN**

Altumash Mufti
600 Pennsylvania Avenue NW
April 3, 2023
Page 27

**efficiencies necessary to compete profitably in the retail sale of Relevant Products.**

TWM objects to this Specification as irrelevant, as well as overbroad and unduly burdensome, as it seeks "all documents" on the designated topics over a period of more than five years. TWM also objects to this Specification because of the unreasonable return date. The FTC staff has provided no theory of relevance for these materials of TWM. In terms of burden, TWM estimates that undertaking the exercise of assembling, reviewing, and producing such materials will add hundreds of thousands of dollars, excluding attorneys' fees, in lost time and productivity at a time when TWM also needs these resources to support immediate demands of its business. The files requested are not centrally maintained and would require a massive and time-consuming effort to locate the materials, before reviewing them for responsiveness and privileged content. Estimated costs would be hundreds of thousands of dollars in employee time and attorney time.

## Specification No. 13

**Submit all documents prepared by or for, or delivered to, the Company's officers, directors, department leadership, investors, or owners relating to the Company's strategies, plans, or budgets for:**
  **(a) the purchase of any Relevant Product from any Distributor; or**
  **(b) the sale at retail of any Relevant Product by the Company.**

TWM objects to this Specification because of the five-plus year time frame of the request and the unreasonable return date. TWM further objects to this Specification as overbroad as it seeks "all documents" on the designated topics. TWM's business is predicated on buying wines and spirits from distributors and then selling those same products at retail. Thus, subparts (a) and (b) cover nearly every aspect of TWM's entire business model and, therefore, is grossly overbroad and would inflict undue burdens on TWM, above and beyond those described above with regard to Specification 12. TWM further objects to this Specification as irrelevant. TWM's board decks and other executive-level materials, along with strategies, plans, and budgets, are not relevant to SG's potential violation of the Robinson-Patman Act, nor has the FTC provided any such theory of relevance. For example, the materials provided to TWM's board and executives predominately relate to topics such as personnel matters, corporate governance, marketing, budgets, advertising, and a myriad of other topics that are unrelated to the FTC's investigation of SG. TWM's interactions with any distributor, let alone SG, are not a focus at the board level. Indeed, TWM's purchases from SG are heavily regulated under state law and provide few opportunities for business strategy or decisions by TWM's board or executives. *See, e.g.*, U.S. Dept. of Treasury, *Competition in the Markets for Beer, Wine, and Spirits*, February 2022 ("Some states require

**GIBSON DUNN**

Altumash Mufti
600 Pennsylvania Avenue NW
April 3, 2023
Page 28

wholesalers to offer uniform pricing for a given product: a single price to all retailers in the on-premise channel, and a single price to all retailers in the off-premise channel. These laws limit retailers' ability to play one distributor off another on price (limiting the ability of distributors to compete on price), and they limit distributors' ability to target particular retailers for price increases or decreases.").

<u>Specification No. 14</u>

**Submit an electronic spreadsheet identifying each Company distribution center, warehouse, or storage facility that has received, or has stored for any period of time, any Relevant Product purchased from a distributor or supplier. For each such facility, provide the following information:**

    (a) **the number or any other unique number, code, or name used by the Company to identify or refer to the facility;**

    (b) **the dates during which the facility has operated;**

    (c) **the street address, city, county, state, and zip code of the facility;**

    (d) **the Company stores supplied or supported by the facility;**

    (e) **the operating region, metropolitan statistical area, or micropolitan statistical area served or supported by the facility;**

    (f) **the total annual volume of Relevant Products, from 2018 until the present, in both dollar value and equivalent cases, distributed from the facility to each Company Store supported or served by the facility;**

    (g) **the annual cost, from 2018 until the present, incurred by transporting Relevant Products from the facility to each Company store supported or served by the facility; and**

    (h) **the annual cost to operate the facility from 2018 until the present.**

As explained in its response to Specification No. 2, TWM does not own or operate any "distribution centers" as it understands that term. TWM's inventory is primarily held in the stores where it sells the products. However, in late 2022, TWM began to utilize warehouse space in two states (i.e., California and Florida) to hold alcohol inventory that could not be received in its retail stores in those states due to insufficient storage capacity. With this exception, TWM's inventory is held in the stores where it sells the products. Where permitted by state law, TWM will occasionally rebalance inventories between stores to meet demand by transferring inventory from one store to another in the same state.

**GIBSON DUNN**

Altumash Mufti
600 Pennsylvania Avenue NW
April 3, 2023
Page 29

**Specification No. 15**

**Submit all documents relating to the Company's strategies, practices, or policies regarding its management of inventory of Relevant Products, including the processes or methods by which the Company:**
   **(a) decides which Company facility will receive each delivery of Relevant Products;**
   **(b) tracks the physical location of Relevant Products ordered by the Company while they remain in the Distributor's possession, custody, or control; or**
   **(c) tracks the physical location of the Relevant Products in the Company's possession, custody, or control.**

TWM objects to this Specification because of the five-plus year time frame of the request and the unreasonable return date.  TWM further objects to this Specification as overbroad as it seeks "all documents" on the designated topics.  TWM further objects to this Specification as irrelevant.  TWM's inventory management is not relevant to SG's potential violation of the Robinson-Patman Act, nor has the FTC provided any such theory of relevance.

**Specification No. 16**

**Submit all documents relating to the Company's strategies, practices, or policies regarding its relationships and interactions with any supplier of a Relevant Product, including:**
   **(a) acts by suppliers to promote or market Relevant Products to the Company;**
   **(b) discounts, rebates, electronic coupons, scan backs, price reductions, or price adjustments provided by suppliers related to any Relevant Product;**
   **(c) communications between the Company and suppliers regarding the Company's expected demands or orders for any Relevant Product; or**
   **(d) sale or delivery of any Relevant Product from suppliers to Distributors in anticipation of, or in response to, orders of such product from the Company.**

TWM objects to this Specification because of the five-plus year time frame of the request and the unreasonable return date.  TWM objects to this Specification as vague and overbroad as it seeks "all documents" on the designated topics.   In the spirit of cooperation, and subject to a reasonable extension of the CID return date and reaching an agreement on other Specifications, TWM would undertake the work and expend the resources needed to provide a written narrative for subparts (b) and (d).

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306
Tel 202.955.8500
gibsondunn.com

Stephen Weissman
Direct: +1 202.955.8678
Fax: +1 202.530.9685
SWeissman@gibsondunn.com

**Specification No. 17**

**Submit all documents relating to the allocation of any Relevant Product by Southern, any supplier, or the Company, including decisions by Southern or any supplier to limit the volume of any Relevant Product available for purchase by the Company or another retailer.**

TWM objects to this Specification because of the five-plus year time frame of the request and the unreasonable return date.  TWM also objects to this Specification as overbroad since it seeks "all documents" on the designated topics.

This Specification calls for documents that are also within the possession of SG.  In the spirit of cooperation, and subject to a reasonable extension of the CID return date and reaching an agreement on other Specifications, if the FTC informs TWM that it was unable to obtain a particular document related to SG's product allocation to TWM, TWM will undertake a reasonable search to locate any such documents so long as the FTC provides the relevant time period and other information to facilitate TWM's efforts.

\*  \*  \*  \*

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306
Tel 202.955.8500
gibsondunn.com

Stephen Weissman
Direct: +1 202.955.8678
Fax: +1 202.530.9685
SWeissman@gibsondunn.com

Please treat these materials as confidential pursuant to the FTC Act and all other applicable state and federal statutes and regulations.

If you have any questions regarding these documents or anything else, please do not hesitate to contact me at (202) 955 – 8678.

Sincerely,

/S/ Stephen Weissman

Stephen Weissman

Partner

GIBSON, DUNN & CRUTCHER LLP